(103 App. Div. 453.)

### CONSOLIDATED FRUIT JAR CO. v. WISNER.

(Supreme Court, Appellate Division, First Department. April 14, 1905.)

**1. CORPORATIONS—TRANSACTIONS WITH PRESIDENT—VOLUNTARY PAYMENT.**

A president of a corporation was individually engaged in a similar business, and purchased goods from the corporation, under a trade custom, for a specific rate, with a provision that, if a lower rate should be given during the season by the corporation or any other competing manufacturer for similar goods to other customers, a rebate should be made. The employés in charge of the president's individual business knew that he had been charged more for the goods than other customers were charged. Prior to any payments made by the president, there was a dispute as to whether the charges were proper, and after negotiations the president finally made payment for such goods. There was no evidence of any fraud practiced on the president. *Held* that, on an accounting between the president and the corporation many years thereafter, he was not entitled to further rebates made by such corporation during such transactions to other customers.

**2. NOTICE TO AGENT—KNOWLEDGE OF PRINCIPAL.**

Where the president of a corporation purchased certain goods manufactured by it for his individual business, and the bills for the goods were sent by the corporation to the place where the president conducted his private business, and the employés of the president who were intrusted with such business had full knowledge of the terms on which the goods were sold to him by the corporation, the information which they received bound him as much as if it had come to him personally.

**3. SAME—ACTION BY CORPORATION.**

Where the president of a corporation, who was engaged in a similar business, purchased goods from the corporation, for which he was charged and paid prices in excess of those charged by the corporation to other

favored customers, contrary to a trade custom by which prices were adjusted by means of rebates according to competition, such president, in the absence of fraud, was not liable for any further sum to the corporation on the ground that he purchased the goods for an inadequate price.

Ingraham, J., dissenting.

Appeal from Judgment on Report of Referee.

Action by the Consolidated Fruit Jar Company against Henry C. Wisner. From a judgment on a referee's report in favor of defendant, plaintiff appeals. Reversed.

Argued before VAN BRUNT, P. J., and HATCH, McLAUGHLIN, O'BRIEN, and INGRAHAM, JJ. .

George A. Strong, for appellant.
William A. Sutherland, for respondent.

O'BRIEN, J. This is an action for an accounting. The complaint alleges that the plaintiff is a corporation engaged in the manufacture and sale of tops or trimmings to glass fruit jars, and that during the years 1883 to 1895, inclusive, the defendant was one of its trustees, and also its president, in which latter capacity he had the chief management, control, and supervision of its business; that during the period specified he was also engaged in an independent business as a dealer in fruit jar ware, including articles of the kind manufactured by the plaintiff; that, in hostility to the plaintiff's interests, he used his official position as its president for the purpose of wrongfully obtaining large quantities of the articles manufactured by it at prices far below their fair market value, and even below the prices which the most favored customers of the plaintiff paid for the same class of goods; that, in order to make unjust profits for himself at the expense of the corporation, he falsified its books, concealed and suppressed invoices, secretly caused large quantities of its manufactured goods to be delivered to himself, and in these and other ways managed its affairs and property in a manner inconsistent with its best interests, and inconsistent with his duties as its president. Upon these grounds the plaintiff prays for an accounting, and that it have judgment for whatever sum may be found due. The defendant, by his answer, denies the allegations which charge him with wrongful conduct and mismanagement, and he alleges that all his official acts were done with the full knowledge and approval of the plaintiff and for its benefit, and that he always has been, and now is, ready and willing to account both as an official of the corporation, and as a private customer thereof. He further alleges that before the commencement of this action he, as plaintiff, had instituted a similar action against the corporation, praying for an accounting, and he pleads that prior action in abatement. See Wisner v. Consolidated Fruit Jar Co., 25 App. Div. 362, 49 N. Y. Supp. 500. The present action was sent to a referee, who, before taking testimony, made a preliminary report to the effect that the former action was not a bar to this one, and an interlocutory judgment was entered directing the defendant to account for the "moneys, goods, and property of the said plaintiff taken, had and received, used and disposed of, by the said defendant to his own use and benefit, and for all his transactions as and while president of the said plaintiff." The interlocutory judgment was

93 N.Y.S.—9

affirmed by the Appellate Division (Cons. Fruit Jar Co. v. Wisner, 38 App. Div. 369, 56 N. Y. Supp. 723), and thereafter the accounting proceeded before the referee, who, at the close of the testimony, found that the plaintiff was indebted to the defendant in the sum of $12,167.06; and from the judgment entered to this effect the plaintiff appeals.

It is not disputed that, covering a period of 15 years, during most of which time the defendant was the president of the plaintiff company, he, as an individual, was buying of plaintiff large quantities of its goods and wares; and the single question before the referee was at what prices he should be charged for the goods thus purchased. As bearing upon this subject, it was established beyond question that during the entire period it was the custom of the plaintiff to agree that the prices charged to its customers for goods purchased by them should be as low as it sold like goods during the season to any other customer, and as low as other competing manufacturers sold like goods to their customers. This custom, it appears, was the result of the sharp competition which existed in the trade. Pooling agreements were made at various times by the manufacturers, but, notwithstanding these, prices were cut by the different firms in order to retain their customers; and plaintiff found it necessary to adopt a similar practice, in pursuance of which it habitually allowed to its customers a rebate after they had purchased the goods, if a lower rate should during the season be given by plaintiff or by any other manufacturer to customers. Not only does the evidence show the existence of such a custom, but upon the trial the plaintiff's counsel conceded that:

"During the years from 1883 to 1894, inclusive, the plaintiff had a practice, among certain of its customers, to charge goods sold by it to the said customers at a certain definite and fixed price, which price was subsequently readjusted by crediting the customer with allowances by way of a certain fixed amount on each grade of goods sold; the amount of said allowance varying in individual cases; such allowances being made by the plaintiff under a general understanding with its customers to charge them a fair market price for their goods, and ascertaining from such customers prices at which they claimed they could have bought the same goods from other manufacturers; and then the allowances were made to satisfy the customer and keep the trade."

The evidence also shows that, acting under this custom, there was no settled price at which these goods were sold from year to year—the only standard being that fixed by the agreement of the plaintiff to protect its customers against lower prices by any of its competitors—and such a standard necessarily produced a vacillating, elastic, and uncertain amount, liable to be readjusted at any time after actual payment of the bills for goods purchased. It also appeared that prior to the time the defendant became plaintiff's president his dealings with the corporation were governed by this custom, and it is shown that no change was made in this respect after he became its president. During the latter period, so long as he dealt openly and fairly with the corporation, and did nothing inconsistent with its welfare or his duties as its president, he was entitled to continue to deal with it as he had theretofore done, under the custom which had become so well established that it amounted to a general understanding among purchasers of the plaintiff's goods.

The evidence showed that, after making purchases of the plaintiff, the defendant had frequently been allowed rebates in conformity with this custom. He, however, claims now that such rebates were insufficient, and that, after deducting them, he has still been charged and has paid higher prices for the goods purchased by him than other customers paid for the same classes of goods. The referee found in his favor in this respect—that he had overpaid for the goods purchased—and the evidence tends to support this finding. Many specific instances were shown where he had been charged and had paid more than other customers paid during the same season for like goods, but it is not necessary, in the view we take of the case, to determine whether the amount of such overpayments has been correctly found by the referee. Even though the defendant made such overpayments, he is not now in a position to recover them. All the goods which he purchased from the plaintiff he has paid for many years ago at the prices charged. Prior to the time the payments were made there was a dispute as to whether the charges were proper, and after negotiations between the parties the defendant finally made the payments. It is not claimed that any fraud was practiced upon him by the plaintiff, and, indeed, as its president, and having charge of its business, he was the official who had the power and right to make rebates and allowances to customers, and therefore had full knowledge of what was paid by the different purchasers for the goods which they bought. If he was charged more for his goods than other customers were charged for like articles, that fact became known to him in his official capacity; and if he wished, as an individual customer, to claim further rebates than had been allowed him, he was bound to do so before he voluntarily paid the prices which he had been charged. By voluntarily yielding to the claim of the corporation—there being no duress of his person or his goods, and no fraud practiced upon him—the payment concludes him. If he intended to litigate the right of the corporation to receive the prices which it had charged him, he was bound at the time to take that position, and resist the demand then made upon him. Flower v. Lance, 59 N. Y. 603–610; N. Y. & H. R. Co. v. Marsh, 12 N. Y. 308; Bennett v. Bates, 94 N. Y. 354–373; People v. Stephens, 71 N. Y. 527–558; Stern v. Ladew, 47 App. Div. 331, 62 N. Y. Supp. 267. Nor do we think the force of this rule is weakened by the suggestion that there could not have been any settlement of these accounts so long as the defendant was plaintiff's president, and the sole arbiter of the prices charged for its goods. It may be true that the prices so fixed would not be binding or conclusive on the corporation; but upon the defendant, when finally adjusted and settled, they were conclusive, in the absence of fraud or mistake.

The defendant asserts, however, that the bills for the goods were sent by the plaintiff to the Rochester office, where his private business was conducted, and that he did not personally know the prices charged for the different articles when he paid the bills, and he claims that this relieves him from the effect of the rule of law just stated. There is no merit in this claim. The defendant's clerks

and employés in his Rochester office, to whom he intrusted his business, had full knowledge of the terms upon which the goods were sold to him by the corporation, and the information which they received binds him just as much as it would if it had come to him personally. A man cannot place his business in the hands of agents and employés, and then escape liability for their acts which are done in the regular course of business, and are within the scope of their duties. This being the conclusion at which we have arrived, it follows that, though the defendant may have overpaid for the goods purchased by him, he is precluded from recovering the amount of such overpayments in this action, and therefore the affirmative judgment in his favor is wrong.

But the decision of the referee equally prevents a recovery by the plaintiff. As already stated, the plaintiff's claim is based upon the theory that the defendant, while acting as its officer, fraudulently obtained goods for himself individually at prices lower than the fair market value thereof, and lower than the prices which the most favored customers paid for similar goods. Upon the hearings before the referee there was no evidence presented, as we read the record, which tends to show any fraud or concealment on the part of the defendant in his official position; and the referee's findings and decision establish the fact that the defendant paid for his goods more than other customers paid for like goods, and more than he was obliged to pay under the custom which governed his business dealings with the corporation. This finding, which, as we have said, is supported by the evidence, conclusively establishes the fact not only that the defendant has paid a fair value for the goods which he purchased, but, further, that the plaintiff has received more for them than it was entitled to receive. It therefore could recover nothing further from the defendant upon this accounting. In other words, the situation, as shown by the present record, is this: The plaintiff claims that the defendant has paid less than the proper and fair price for the goods which he has purchased of it, but the evidence tends to support the referee's finding that in fact he has paid more than he could fairly have been required to pay. This being so, he is manifestly not indebted to the corporation in any sum whatsoever, and, as a result of the accounting, the complaint should have been dismissed, with costs.

It follows that the judgment should be reversed, and a new trial ordered, with costs to appellant to abide the event. All concur, except INGRAHAM, J., who dissents.